IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

GREAT NORTHERN INSURANCE )
COMPANY, )
                                             )
        Plaintiff, )
                                             )    Case No. 12-CV-25-JED-FHM
v. )
                                             )
JOHN WATSON LANDSCAPE )
ILLUMINATION, INCORPORATED, )
                                           )
        Defendant. )

## **OPINION AND ORDER**

**I.    Background**

This case involves a September 2010 fire that caused substantial damage to the home of Andrew and Denise Hartman. There is no dispute that the fire was caused by the overloading of a neutral wire on the circuit that supplied electrical power for an outside lighting system designed by the defendant, John Watson Landscape Illumination, Inc. (JWLI) in 2005. Another company, Houchin Electric Company, installed the electric service to connect the house to the JWLI landscape lighting.

The Hartmans' home was insured by the plaintiff, Great Northern Insurance Company (Great Northern). As a result of the fire, Great Northern paid over two million dollars on the Hartmans' claim under the homeowner's insurance policy.[1] Asserting rights of subrogation arising from payments made under the insurance policy, Great Northern asserts claims against JWLI for negligence, breach of contract, and breach of warranty. (Doc. 41 at ¶¶ 18-34).

---

[1]     The record is unclear as to the precise amount of damages claimed, or payments made, by Great Northern. Deposition testimony indicates that a total of $2,450,168.55 was paid on the Hartmans' claim. (Doc. 115-10 at 3 [Depo. p. 88]). Great Northern's Third Amended Complaint asserts that damages totaling $2,248,110.00 were incurred. (Doc. 41 at 5, ¶ 17).

JWLI seeks summary judgment (Doc. 82) on several grounds. Its principal argument is that, because Houchin installed the electrical supply to connect the house to the outside lighting, JWLI did not cause the fire and is not responsible for any damages. JWLI also argues that there was no contract in effect between JWLI and the Hartmans at the time of the fire, so that there was no breach of contract and no duty that could give rise to a breach supporting a tort claim. In addition, JWLI contends that the Great Northern insurance policy on the Hartman home excluded coverage for losses resulting from planning, maintenance or construction, or for gradual loss, and that Great Northern is prohibited from recovering in subrogation for losses that were excluded under the policy.

## II.     Summary Judgment Standards

A party may move for summary judgment on any claim or defense. Fed. R. Civ. P. 56(a). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The courts thus determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. The non-movant's evidence is taken as true, and all justifiable and reasonable inferences are to be drawn in the non-movant's favor. *Id.* at 255. The court may not weigh the evidence and may not credit the evidence of the party seeking summary judgment and ignore evidence offered by the non-movant. *Tolan v. Cotton*, ___ U.S. ___, 134 S. Ct. 1861, 1866-68 (2014) (per curiam).

### III. Discussion

#### A. Insurance Policy Coverage

JWLI argues that the damages caused by the fire at the Hartman home were excluded from coverage under the terms of Great Northern's insurance policy on the Hartman home. (Doc. 82 at 23-27). The two coverage exclusions, which apply to both house and contents coverage, provide as follows:

> **Faulty planning, construction or maintenance.** We do not cover any loss caused by the faulty acts, errors or omissions of you or any other person in planning, construction or maintenance. It does not matter whether the faulty acts, errors or omissions take place on or off the insured property. But we do insure ensuing covered loss unless another exclusion applies. "Planning" includes zoning, placing, surveying, designing, compacting, setting specifications, developing property and establishing building codes or construction standards. "Construction" includes materials, workmanship, and parts or equipment used for construction or repair.

(Doc. 115-15 at 44, 134).

> **Gradual or sudden loss.** We do not provide coverage for the presence of wear and tear, gradual deterioration, rust, bacteria, corrosion, dry or wet rot, or warping, however caused, or any loss caused by wear and tear, gradual deterioration, rust, bacteria, corrosion, dry or wet rot, or warping. We also do not cover any loss caused by inherent vice, latent defect or mechanical breakdown. But we do insure ensuing covered loss unless another exclusion applies.

(*Id.* at 132).

According to JWLI, these exclusions apply and there was no coverage because Great Northern's claims are based upon JWLI's alleged failure to inspect and maintain the electrical system and because the wiring damage that resulted in the fire had occurred over an extended period of time. JWLI therefore asserts that Great Northern should not have paid the Hartmans under the policy and cannot recover in subrogation. In response, Great Northern points to the "ensuing covered loss" clauses contained within the exclusions. Those clauses provide that Great Northern does "insure ensuing covered loss unless another exclusion applies." (*Id.* at 44,

3

132, 134). Ensuing loss clauses act as exceptions to exclusions, and they generally "provide coverage for certain covered perils which would otherwise be covered even when that covered peril was caused by an excluded peril." 11 *Couch on Ins.* § 153:70 (3d ed. 2014). "For example, a policy may provide that it does not cover any loss caused by earth movement; however, any ensuing loss by fire which is not excluded or excepted is covered. This means the policy covers loss caused by fire that would not have occurred but for the earth movement; however, other damage caused by the earth movement is not covered." *Id.* Fire and water damage are two common perils which are frequently covered by ensuing loss clauses. *Id.*

Here, Great Northern argues that the coverage exclusions would exclude damages flowing from improper wiring itself, such as the cost of correcting the faulty wiring, but that any additional losses, such as those caused by an ensuing fire, would be covered under the ensuing loss clause. That argument is consistent with the construction frequently applied to ensuing loss clauses. *See* 11 *Couch on Ins.* § 153:70. For example, in *Vision One v. Philadelphia Indemnity Ins. Co.*, 276 P.3d 300 (Wash. 2012) (en banc), the court explained ensuing loss coverage and provided an example that is relevant to this case:

> While coverage may be excluded when a certain peril causes a loss, a resulting or ensuing loss clause operates to carve out an exception to the policy exclusion. For example, a policy could exclude losses "caused directly or indirectly" by the peril of "defective construction," but then an ensuing loss provision might narrow the blanket exclusion by providing that "any ensuing loss not excluded is covered."
>
> In this way, ensuing loss clauses limit the scope of what is otherwise excluded under the policy. Such clauses ensure "that if one of the specified uncovered events takes place, any ensuing loss which is otherwise covered by the policy will remain covered. The uncovered event itself, however, is never covered."
>
> An example helps illustrate how the ensuing loss clause works. Suppose a contractor miswires a home's electrical system, resulting in a fire and significant damage to the home. And suppose the homeowner's policy excludes losses caused by faulty workmanship, but the exclusion contains an ensuing loss clause. In this

4

situation, the ensuing loss clause would preserve coverage for damages caused by the fire. But it would not cover losses caused by the miswiring that the policy otherwise excludes. Nor would the ensuing loss clause provide coverage for the cost of correcting the faulty wiring.

*Id.* at 307 (citations omitted).[2]

In a case involving insurance policy exclusions similar to those referenced by JWLI here, the court held that water damage which followed faulty home construction was an "ensuing loss" and was thus covered under an ensuing loss clause. *See Eckstein v. Cincinnati Ins. Co.*, 469 F. Supp. 2d 444, 454 (W.D. Ky. 2007). The applicable policy exclusions, like those involved in this case, were titled "Gradual or Sudden Loss" and "Faulty Planning, Construction or Maintenance," and those policy terms contained ensuing loss clauses. *Id.* In determining that water damage that followed the faulty home construction was covered under the ensuing loss clauses, the court reasoned as follows:

> Though the policies contain a provision for "resulting" or "ensuing" losses, the policies do not define those terms. "The words employed in insurance policies, if clear and unambiguous, should be given their plain and ordinary meaning." *Dictionary.Reference.com* defines ensuing as "to follow as a consequence or result" or "to take place subsequently." Courts have defined an ensuing loss as "a loss that is not directly caused by faulty workmanship or faulty materials, but nonetheless follows as a chance, likely, or necessary consequence of the loss caused by faulty workmanship or faulty materials." ...
>
> Plaintiffs' argument pursuant to the terms of the policies is that exceptions providing for coverage in the event of an ensuing loss allow for coverage on these facts. The parties do not dispute that the policies initially provide coverage for this claim under their "occurrence" language. The parties also do not dispute that the Policies contain two exclusions, a "Gradual or Sudden Loss" exclusion and a "Faulty Planning, Construction or Maintenance exclusion." The only issue is whether the exceptions to the exclusions, which provide coverage in the event of an ensuing loss, are applicable. The Plaintiffs contend that the major damage in this case is water damage and that such damage is an ensuing loss from the faulty construction and, thus, covered by the Policies.

---

[2] There appears to be no applicable Oklahoma authority on the precise issue presented.

> The Court finds that case law and the dictionary definition of ensue supports the Plaintiffs' argument. There is nothing in the policies to indicate that an ensuing loss must be the result of a separate cause from the excluded loss. To the contrary, the policies are clear that faulty construction losses are excluded, but losses taking place afterward, or as a result of faulty construction, are covered. The exclusions still apply despite the applicability of the ensuing loss provision. For example, water damage ensuing from a defective roof is covered as an ensuing loss, but the exclusion for faulty construction excludes coverage to repair the roof. Such an interpretation is consistent with the reasonable expectations of the insureds.

*Id.* at 454 (citations omitted).

Under Oklahoma law, an insurance policy is a contract which, "like any other contract of adhesion, is liberally construed, consistent with the object sought to be accomplished, so as to give a reasonable effect to all of its provisions, if possible." *Dodson v. St. Paul Ins. Co.*, 812 P.2d 372, 376 (Okla. 1991). "The construction of an insurance policy should be a natural and reasonable one, fairly construed to effectuate its purpose, and viewed in the light of common sense so as not to bring about an absurd result." *Id.* (quoting *Wiley v. Travelers Ins. Co.*, 534 P.2d 1293, 1295 (Okla. 1974)). As in the foregoing cases, the "ensuing covered loss" exception to the policy's exclusionary language clearly applies to the fire damage to the Hartmans' home. The continuing faulty wire setup caused the circuit to be overloaded, which resulted in overheating and caused the fire. The damages that Great Northern paid were damages caused by the ensuing fire, and the unambiguous "ensuing covered loss" provision in the insurance policy applies such that those ensuing fire damages were covered under the Great Northern insurance policy.

Accordingly, JWLI is not entitled to summary judgment on its argument that Great Northern should not have paid on the insurance policy for the fire damages caused to the Hartmans' home.

**B.     JWLI's Performance of Maintenance and Troubleshooting Services and Its Agreement to "Evaluate Electrical System"**

Great Northern's claims largely rely upon JWLI's agreement to perform services to "evaluate electrical system" and JWLI's troubleshooting of repeated tripping of the circuit breaker connected to the outdoor lighting system. In July 2008, JWLI provided a Guaranteed Maintenance Agreement (Doc. 82-13), which provided for the following:

> [a] program ... to accommodate [JWLI's] most valued clientele in Oklahoma by providing a convenient system to maintain the integrity of an original John Watson Illumination design. We will schedule and perform our 'Five Point Evaluation' two times a year, during the Spring & Fall, to ensure that the JWLI design is preserved in the same condition as the day it was installed – no matter how long since the initial installation!

(*Id.*). The agreement further represents that a "service team" would conduct each "evaluation." (*Id.*). The "Five Point Evaluation" to be conducted by JWLI included the following:

1) Inspect each lighting unit to ensure proper function
2) Review positioning of each lighting unit to maximize illumination effect.
3) Determine any needs to relocate existing units to expand illumination coverage or recreate original lighting design
4) Assess any pruning needed to recreate the original Moonshadow and aesthetic effects.
5) Evaluate electrical system and reset activation devices if needed.

(*Id.*).

JWLI asserts that the Guaranteed Maintenance Agreement expired in July of 2009, such that JWLI may not be held liable (under any theory) for the September 2010 fire. However, John Watson, the President and owner of JWLI, testified that, in June of 2010, a few months before the fire at the Hartman home, JWLI conducted the same five-point evaluation at the Hartman residence that was referenced in the Guaranteed Maintenance Agreement, because JWLI conducted such evaluations as part of its normal maintenance reviews. (Doc. 115-4 at 5-6

7

[Depo. pp. 147-148]). Thus, it is undisputed that JWLI actually undertook to perform a five-point evaluation as part of its service provided in June of 2010.

In asserting that the Guaranteed Maintenance Agreement was an annual contract which had to be renewed each year, such that it had expired under JWLI's argument, JWLI repeatedly misstates the actual title of the contract:

> The contract which the Plaintiff references as having been "breached" is the "Premier Annual Maintenance Contract" which was paid for by the Hartmans in July 2008. However, the conduct and actions by [JWLI] which the Plaintiff claims caused the fire occurred in 2010. By its terms, the "Premier Annual Maintenance Contract" paid for in 2008 is an "annual" contract.... There is simply no language in the "Premier Annual Maintenance Contract" which would extend that *annual* contract for additional years without additional payment.

(JWLI's Motion for Summary Judgment, Doc. 82 at 18, citing Doc. 82-13; *see also* JWLI's Reply Brief at 6 ["By its very terms, the 'Premier *Annual* Maintenance Contract' paid for in 2008 is an 'annual' contract."]). The Court has reviewed the contract numerous times. As noted, the contract at issue is the Guaranteed Maintenance Agreement, which is *not* titled "Premier Annual Maintenance Contract," nor is the term "annual" located anywhere in the document. (Doc. 82-13).[3]

The contract does not define its term. While there is language indicating that the "evaluation" would be conducted "two times a year," the contract does not specify that an additional fee was required to be paid every year for continuation of the "program." The contract also contains language that could be construed in a manner that the term would last as long as the customer had the JWLI-designed lighting system. (*See id.* [referring to the agreement

---

[3] In support of its argument that the Guaranteed Maintenance Agreement was an "annual" contract, JWLI attached to the back of the agreement a *separate* invoice dated more than two weeks after the Hartmans and JWLI entered into the Guaranteed Maintenance Agreement. (*See* Doc. 82-13 at 3). JWLI's unilateral description on the invoice does not alter the actual title or terms of the contract which had, according to JWLI's own argument, been agreed to more than two weeks before.

8

as a "program" that would "ensure that the JWLI design is preserved in the same condition as the day it was installed – no matter how long since the initial installation!"]). The Guaranteed Maintenance Agreement also provided that "clients who choose not to participate in our guaranteed maintenance program will incur a $250.00 service fee each time we visit your property." (*Id.*). The record is silent as to whether JWLI invoiced the Hartmans $250.00 for each visit to the Hartman property after, as JWLI alleges, the contract expired in July 2009. If it did not bill the service fee, that would support a construction of the contract as applying for some term longer than the "annual" term which JWLI advocates but is not found in the contract itself, particularly in light of Mr. Watson's testimony that JWLI conducted the five point evaluation at the Hartman home in June 2010.

In any event, JWLI has not cited any authority in support of the proposition it advances: that a contracting party is barred from bringing a breach of contract claim following the expiration of a contract's term. Even assuming the term of the Guaranteed Maintenance Agreement expired prior to the fire at the Hartman home, a claim for a breach of that agreement could be brought within five years. *See Okla. Stat.* tit. 12, § 95(1). Under Great Northern's theory, if JWLI had actually evaluated the electrical system that supplied electricity to the outdoor lighting, the electrical problem that caused the fire would have been detected and corrected and there would not have been a fire. (*See* Doc. 115 at 14). JWLI's own expert acknowledged in deposition that, had there been a proper evaluation of the electrical system, or if there had been a proper examination of the cause of the breaker for the outdoor lighting repeatedly tripping, there would not have been a fire. (*See* Doc. 115-12 at 3-6 [Depo. pp. 6-7, 17, 31]). Great Northern thus argues that, even assuming expiration of the Guaranteed Maintenance Agreement in July 2009, JWLI failed to properly evaluate the electrical system as it

was required to do in 2008-2009, which resulted in the fire. That theory is consistent with alleging a breach of contractual obligations while the contract was undisputedly still in effect. This action was brought less than five years after the alleged expiration of the contract and less than five years after the contract was allegedly breached.

JWLI also attempts to avoid the language in the Guaranteed Maintenance Agreement by arguing that JWLI "did not perform electrical" work or services at the Hartman home and was not qualified to do electrical work. (Doc. 82 at 12, 19; Doc. 119 at 3, 4). A reasonable reading of the language of the agreement is to the contrary, as it refers to evaluating the "electrical system." The parties offer different constructions of that obligation. JWLI argues that the obligation applied only to the light fixtures which JWLI had installed. Great Northern asserts that the term is not limited to examining the light fixtures, and instead required JWLI to evaluate the electrical system that supplied power to the outdoor lighting.

Under Oklahoma law, the question of whether a contract term is ambiguous is a question of law for the court. *Ahlschlager v. Lawton School Dist.*, 242 P.3d 509, 515 (Okla. 2010). The application of an unambiguous contract term is also a legal issue for the court. *Id.* "[A] contract term is ambiguous if it can be interpreted as having two or more meanings." *Id.* Where the meaning of an ambiguous contract is in dispute, evidence of extrinsic facts and circumstances may be admissible to establish the intention of the parties. *Id.* And the construction of such an ambiguous contract "'becomes a mixed question of law and fact and should be submitted to the jury for its determination under proper instructions by the court.'" *Id.* (citation omitted).

The determination of whether a contract is ambiguous is made after applying the rules of contract construction. *See Atain Specialty Ins. Co. v. Tribal Constr. Co.*, 912 F. Supp. 2d 1260, 1268 (W.D. Okla. 2012) (citing *Dodson v. St. Paul Ins. Co*., 812 P.2d 374, 376-77 (Okla. 1991)

and *State ex rel. Comm'rs of Land Office v. Butler*, 753 P.2d 1334, 1336-37 (Okla. 1987)). Pursuant to Oklahoma's rules of contract construction, a contract must be interpreted "to give effect to the mutual intention of the parties, as it existed at the time of contracting, so far as the same is ascertainable and lawful." *Okla. Stat*. tit. 15, § 152. The language of the contract is to govern its interpretation, so long as "the language is clear and explicit, and does not involve an absurdity." *Id.* § 154; *see also id.* § 155.

Here, in light of the record evidence, the agreement's language - "[e]valuate electrical system" - can be interpreted as having two or more meanings. The Hartmans indicated that they relied upon JWLI to evaluate the entire electrical system that supplied power to the outdoor lighting. That expectation is not unreasonable given the language of the contract. In addition, JWLI's proposed limitation - that the "electrical system" as to which it had any obligation was the "light fixtures" JWLI had installed - would be duplicative of the first of the "five point evaluation" and would thus render it a four point evaluation. The Court notes that JWLI's submission of work orders, each signed by one of the Hartmans, stating that electrical work would be completed by the customers' electrician of choice and would be billed separately, may lend some weight to JWLI's construction of the contract. (*See* Doc. 82-15, 82-16, 82-17). However, JWLI's counsel also acknowledged at the hearing on the motion that the contract language "evaluate electrical system" is "a poor choice of words" and "could lead someone to believe it was something more" than a requirement to check just the lights. The Court concludes that there is an ambiguity as to the intended scope of the required "evaluat[ion of] electrical system," which requires submission of the case to a jury. *Ahlschlager*, 242 P.3d at 515.

There is also evidence supporting Great Northern's argument that JWLI employees did, in fact, perform "electrical work" while working at the Hartman home. On multiple occasions,

11

when the Hartmans reported that the outdoor lights were not working, JWLI employees performed service at the Hartman home, which included work on the lights, but also included resetting the breaker, then leaving. (*See* Doc. 82-20 at 5 [Depo. p. 14]; Doc. 82-21 at 6 [Depo. p. 6]). Great Northern's expert opined that JWLI's making electrical connections and troubleshooting was the performance of electrical work. (Doc. 115-11 at 3-4 [Depo. pp. 153-154]).

Dameon Shawn Harrison, who is described in briefing as JWLI's Operations Manager, testified that JWLI employees would be expected to turn a circuit breaker on to test lighting, but if they did not detect why the breaker had tripped, they were to inform the client that an electrician was needed. (*See* Doc. 115-14 at 4-5 [Depo. pp. 20-21]). John Watson testified that he understood that the overloading of a circuit is one reason a circuit breaker may trip, and that his employees were supposed to turn a tripped breaker off before leaving:

> Q.  So is overloading of a circuit one reason why a circuit breaker can trip?
>
> A.  Yes.
>
> Q.  Okay. So once one of your employees finds that a circuit breaker is tripped and they then turn it back to the on position and everything works, at that point do you expect them to notify the client about what they did?
>
> A.  If that issue came up, yes, they would have notified the client that when they turned the breaker, it came back on, and before they leave, they turn the breaker back off so the client knows that that's the issue.

(Doc. 115-13 at 58 [Depo. p. 120]). One of the JWLI employees also testified that he understood that "something" was causing the breaker to trip, and he understood that it could be tripped by an overload of the breaker. (Doc. 115-3 at 7 [Depo. p. 16]). Yet, before leaving the Hartman residence, JWLI would reset the breakers and leave them on, and it does not appear that the JWLI employees who reset the tripped breakers informed the Hartmans that there was any

electrical problem or informed them that there was any need to call electricians. (*See* Doc. 115-3 at 63; Doc. 82-20 at 5 [Depo. p. 14]; Doc. 115-8 at 3-4 [Depo. pp. 69-70]). Taken as true and in a light favorable to Great Northern, this evidence indicates that JWLI employees reset and improperly left the breaker on without providing the Hartmans any notice of a potential electrical problem that needed to be investigated.

There are genuine disputes of material facts, including the scope of JWLI's contractual duty to "evaluate electrical system," whether JWLI breached its obligation to conduct that evaluation, whether JWLI performed other services in a negligent manner, and whether the alleged breach of contractual duties or the standard of care caused damages to the Hartman home. As a result, summary judgment is inappropriate on Great Northern's contract and negligence claims. Based on the evidence, which must be taken as true and drawn in Great Northern's favor at the summary judgment stage, a reasonable jury could find that a contract was formed, JWLI breached it, and damages were incurred as a direct result of the breach. *Digital Design Group, Inc. v. Information Builders, Inc.*, 24 P.3d 834, 843 (Okla. 2001).

In addition, under Oklahoma law, "there is implied in every contract for work or services a duty to perform it skillfully, carefully, diligently, and in a workmanlike manner," and a breach of that duty "is a tort, as well as a breach of contract." *Keel v. Titan*, 639 P.2d 1228, 1231-32 (Okla. 1981). "With respect to the skill required of a person who is to render services, it is a well-settled rule that the standard of comparison or test of efficiency is that degree of skill, efficiency, and knowledge which is possessed by those of ordinary skill, competency, and standing in the particular trade or business for which he is employed, or ... 'such care and skill as a reasonably competent and skillful person should have exercised in the performance of his contractual obligation.'" *Id.* (quoting *Cox v. Curnutt*, 271 P.2d 342, 345 (Okla. 1954)).

JWLI further argues that it is entitled to summary judgment on the negligence claim because there is no evidence that its outdoor lights caused the fire. That is true. However, there is evidence here that JWLI did more than simply install its lights. It agreed to "evaluate electrical system" and actually undertook to conduct a five-point evaluation in 2010. JWLI also performed service calls during which its employees were aware that the breaker for the outdoor lighting tripped and that an electrical overload could be causing the breaker to trip, but did nothing to investigate the cause of the tripping and did not report to the Hartmans that there was a potential problem with the electrical system. JWLI's expert testified that, had there been a proper evaluation of the electrical system, or if there had been a proper examination of the cause of the breaker for the outdoor lighting repeatedly tripping, there would not have been a fire. (*See* Doc. 115-12 at 3-6 [Depo. pp. 6-7, 17, 31]). This evidence is sufficient to require the submission of the causation issue to a jury. *See Keel*, 639 P.2d at 1232 ("'Causation traditionally lies within the realm of fact, not law. In an action for injuries caused by the defendant's negligence, it is a jury question whether the injurious consequences resulting from the negligence could have reasonably been foreseen or anticipated ... [except when only] one reasonable conclusion can be drawn from the facts.'") (quoting *Atherton v. Devine*, 602 P.2d 634, 637 (Okla. 1979)); *Thompson v. Presbyterian Hosp., Inc.*, 652 P.2d 260, 263 (Okla. 1982) ("As a general rule, the question of proximate cause in a negligent tort case is one of fact for the jury. It becomes one of law when there is no evidence from which the jury could reasonably find a causal nexus between the negligent act and the resulting injuries.") (footnote omitted).

JWLI also seeks summary judgment on Great Northern's warranty claim on the ground that it is undisputed that "the fire was caused by the electrical system," and not the lighting system designed and installed by JWLI. (Doc. 82 at 16). In response, Great Northern asserts

that its warranty claim is premised, not upon nonconforming goods, but upon breach of an implied warranty that JWLI would perform its work or services skillfully and in a workmanlike manner. (Doc. 115 at 19-20). Great Northern cites the Guaranteed Maintenance Agreement between JWLI and the Hartmans, pursuant to which JWLI agreed, among other things, to evaluate the electrical system. (Doc. 115-5). According to Great Northern, JWLI's agreement to evaluate the electrical system and circuit breaker troubleshooting created an implied warranty that such work and services would be performed in a reasonable and workmanlike manner, which JWLI failed to properly perform. (Doc. 115 at 20).

Great Northern has abandoned any express warranty claim, as it does not assert the existence of any express warranty in its summary judgment response. (*See id.*). In support of its "implied warranty" claim, Great Northern cites a single case, *McCool v. Hoover Equip. Co.*, 415 P.2d 954, 958 (Okla. 1966). In *McCool*, the defendant chromed used crankshafts for the plaintiff to resell to its customers for installation in caterpillar equipment. The crankshafts all failed during early stages of use, and plaintiff sued the defendant for damages under a theory that the defendant had defectively chromed the crankshafts and breached an implied warranty that the crankshafts would be fit for the particular purpose of being used in the caterpillar machines. 415 P.2d at 956, 958. The trial court found "that under the facts and circumstances presented in this case, defendant impliedly warranted to plaintiff that the rechromed crankshafts furnished by it would be reasonably fit for use as crankshafts in machines for which said crankshafts were originally manufactured to fit." *Id.* at 958. The plaintiff was successful as to certain crankshafts, but lost as to six other crankshafts as to which the trial court determined there was no evidence to show that the chroming had caused them to fail. *See id.*

JWLI argues in its reply that *McCool* does not apply because that case predominately involved the performance of services, whereas "the sale of goods – the landscape lighting system, its design and component parts – clearly predominated" JWLI's relationship with the Hartmans. (Doc. 119 at 5). To the contrary, the record evidence provided by JWLI establishes that it initially undertook to provide a "Landscape Illumination study" for the Hartman residence (Doc. 82-7) and designed the outdoor lighting system and added components from time to time (Doc. 82). The nature of its contract with the Hartmans was thus initially to provide design services and install lighting. Moreover, its Guaranteed Maintenance Agreement was predominately, if not entirely, a services contract.

The plaintiff's warranty claim under *McCool* appears somewhat duplicative of a claim under a *Keel* negligence theory, and the reasoning of *Keel* appears a better fit to the facts alleged in this case than does a *McCool* theory of breach of a warranty for a particular purpose. However, at this time, the Court will deny summary judgment as to the warranty claim, as a plaintiff may advance alternative arguments for recovery, and JWLI presented no other argument to reject an application of *McCool* other than the goods / services distinction it argued as applicable to this case.

For the foregoing reasons, the Court concludes that there are genuine issues of fact precluding summary judgment on Great Northern's contract, negligence, and warranty claims.

IT IS THEREFORE ORDERED that JWLI's Motion for Summary Judgment (Doc. 82) is **denied**.

DATED this 17th day of March, 2015.

JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE

16